[Civ. No. 14360. Second Dist., Div. Two. Nov. 22, 1944.]

Estate of CLEMENCE KAUFFMAN, Deceased.

Estate of LEON E. KAUFFMAN, Deceased.

LORRAINE K. MEYBERG, Appellant, v. LAZARE M. KAUFFMAN, Respondent.

Mitchel S. Meyberg and Leonard J. Meyberg for Appellant.

O'Melveny & Myers and Pierce Works for Respondent.

McCOMB, J.—This is an appeal by contestants from orders settling the (1) first and second accounts in the estate of Clemence Kauffman, and (2) second and third accounts in the estate of Leon Kauffman, of the administrator with the will annexed of such estates.

There are two questions presented for our determination which will be stated and answered hereunder seriatim:

First: *Was there substantial evidence to sustain the trial court's finding as follows:*

*"The Court finds that with the outbreak of war on September 1, 1939, a sharp rise in wool prices resulted, following in about October with a leveling off and decline; that, as had been the custom as far back as during Leon E. Kauffman's lifetime, purchases of pelts were made for the packers during this period upon an understanding that adjustments in price would be made in accordance with market trends; that Leonard J. Meyberg, objector's husband, so assured the packers during the absence of proponent in Hawaii during this period; that such adjustments were later made, the*

*result of which was to increase the cost of pelts in line with the rising prices of September, despite the falling prices in October and November. There were also involved end of year expenses which did not appear in the interim statement of September 30?"*

This question must be answered in the affirmative and is conclusively demonstrated by taking the component parts of the finding and setting forth the evidence in support thereof thus:

Finding:

"The Court finds that with the outbreak of war on September 1, 1939, a sharp rise in wool prices resulted, followed in about October with a leveling off and decline; . . ."

Evidence in support thereof:

Witness L. M. Kauffman testified:

"Q. Was there any rise or fall in the pricing market? A. Yes, there was in September 1939; war broke out and prices skyrocketed, both for wool and pelts.

"Q. Can you give us some idea now as to what the extent of that price rise was in September? A. I believe it was approximately 10 cents a pound.

"Q. All right. Now, what occasioned to change that situation as between September and November of 1939? A. Well, the anticipated rise in price for wool was short lived and prices shot up and declined rapidly and we had to sell the wool or ship the wool or bill the wool out for Leon, Inc. at lower prices after October than we did in October.

"Q. All of your products are sold to Leon, Inc., is that correct? A. That is correct, yes.

"Q. That is a corporation in which yourself on the one hand, and Mr. and Mrs. Meyberg on the other, each own 2500 shares of stock? A. Yes."

Finding:

"That, as had been the custom as far back as during Leon E. Kauffman's lifetime, purchases of pelts were made for (from?) the packers during this period upon an understanding that adjustments in price would be made in accordance with market trends; . . ."

Evidence in support thereof:

Witness L. J. Meyberg testified:

"Q. You supervised the pricing of purchases from the packers during the fall of 1939 yourself? A. Yes.

"Q. Upon what did you base your pricing during the period the two boys were away? A. The basis of pricing that I used was the basis of the prices that were being obtained by Leon, Inc. in Boston at the time.

"Q. Do you mean by that— A. Differentials; in other words, if the price previous to that particular time was a dollar on top wools a pound, and the top wools were sold then for 90 cents, then it would be lowered. If it was raised to a dollar and ten cents it would be raised.

"Q. Well, let me see if I understand you, you would obtain information from Boston one way or another as to the prices at which the finished and scoured wool, let's say, was being sold by Leon, Inc.? A. That is correct.

"Q. That would have been wool that had been shipped east from L. Kauffman Company perhaps months before, is that correct? A. That is correct, that is right.

"Q. And then you would apply some kind of a slide rule to those prices derived on previously sold wool and tell the packers that that derived price was what you would pay for their pelts? A. That derived price, substantially, you are correct; in other words, if the price that we were selling the wool, if the price at which the wool was being sold in Boston on the various grades, they were divided into four general grades at that time, went up, then proportionately I would tell them that those were the prices that we were getting and that he would pay accordingly a raising price.

"The Court: If there was a 10 per cent rise in the price of wool on the Boston market, you gave a 10 per cent rise in the pelts? A. I didn't take a full 10 per cent rise.

"The Court: Pardon? A. A portion of that 10 per cent rise, so as to be on the safe side and I had known that L. Kauffman Company for many years prior had operated on somewhat the same arrangement and same policy with the packers, to recognize any adjustment that might be due them on the basis of the price that the wool would bring in Boston.

"Q. (By Mr. Works): That had been a practice of Mr. Leon E. Kauffman's during his lifetime, wasn't it? A. I had done the same.

"Q. Just a minute, please. If he had bought pelts at a certain price from the packer out here and then shipped them east, whether before or after the advent of Leon, Inc., makes no difference, and then the price of the wool went up

intermediate the time of the purchase and the time of the purchase and the time of the shipment to the east and the ultimate sale, it was common practice for him to make an adjustment to the packers out here in contemplation of the rise in price, isn't that true? A. Yes, and had been for—

"Q. But that is— A. Pardon me. let me answer my question. Have I or not?

"Mr. Works: I think you have answered it. A. The policy established by Mr. Leon Kauffman with regard to the pricings to the packer was on the basis of the assurance to the packer that he would pay him more over the period of a year for his pelts than he could get from any other source, not a question of bargaining from day to day as to what he would buy them from him at.

"Q. I understand that, but what I am asking you about is this, it was a common practice during Mr. Kauffman's lifetime to grant adjustments, or call them rebates, if you will, to the packers out here, according to how the price of the finished wool fluctuated in Boston, isn't that true? A. According to what he could sell for it, yes."

Finding:

"That Leonard J. Meyberg, objector's husband, so assured the packers during the absence of proponent in Hawaii during this period; . . ."

Evidence in support thereof:

Witness L. J. Meyberg testified:

"Q. And you told these packers while these boys were away in Hawaii and if the prices continued to rise, the wool prices, due to war conditions or otherwise, that you would or the company would, rather, make an adjustment in price to these packers, is that correct? A. That is correct, if the value of the skins that we had purchased from them, if the market indicated that we had not fully paid them for them, that we would make an adjustment to them, that is correct, owing to the particular phase of the market at that time.

"Q. I suppose it is reasonable to assume that if the company doesn't maintain the good will of the packers it hasn't any business, isn't that correct? A. Yes."

Finding:

"That such adjustments were later made, the result of which was to increase the cost of pelts in line with the rising

prices of September, despite the falling prices in October and November.''

Evidence in support thereof:

Witness L. J. Meyberg testified:

''Q. Do you know of your own knowledge that when Mr. Grossman returned that he gave them rebates, or rather, refunds, because you had given them too little for their pelts? A. Yes. The war had been declared, I believe, if I remember correctly, just shortly, the war between Germany and England, just shortly before these boys went away, and the market was quite strong and rather jumpy at the time and I had talked with some of the packers and had told them that we didn't know what that market was going to be and that we couldn't pay any great amount of rise, but that if after we obtained the purchases we found that the market warranted it that the business would adjust the prices with them for what purchases had been made; and the market did maintain rather strong and a number of them, in fact, most of them asked for an adjustment in that respect, and I went over it with them and a number of adjustments were made.''

Finding:

''There were also involved end of year expenses which did not appear in the interim statement of September 30.''

Evidence in support thereof:

Witness John K. Herr testified:

''A. Well, there is an item of supplies that is extremely large in the books for the month of November occasioned by the fact that supply bills at the end of each month are not entered as an account payable at that time. They are carried over and paid on the 10th of the following month, except the month of November, at the end of the fiscal year, when on November 30th all bills are paid and included in that month, which would make a two months' supply bill charged in the month of November, instead of one. There is a bonus —there was bonus paid on the year 1939, which was put in the salary expenses for the month of November.

''The Court: There is also a big difference in the inventory item on those two sheets? A. Yes, and there is a depreciation item of forty-seven hundred odd dollars —

''The Court: At the conclusion of the fiscal year. A. At the conclusion of the fiscal year.

"The Court: But one charged in the semi-monthly— A. It was not charged in any month except at the end of the year.

"The Court: All right."

■ Second: *Was there substantial evidence to sustain the trial court's finding as follows:*

"*The Court finds that all compensation and salaries paid for services rendered L. Kauffman Company as reflected by the accounts, including compensation and salary paid one Henry Grossman, represented the reasonable value of services actually rendered?*"

This question must likewise be answered in the affirmative. The questioned finding is supported by the following testimony given by respondent:

"Q. Mr. Works: Now, there are a number of objections to wages and salaries paid to employees of L. Kauffman Company. Will you state whether or not to the best of your knowledge, information and belief the accounts on file and objected to in these proceedings correctly state the amount of wages and salaries earned and paid to employees of Kauffman Company? A. Yes, they did.

"Q. Bonuses are also reflected? A. They are, yes.

"Q. To the best of your knowledge, information and belief, were these bonuses given for services rendered to L. Kauffman & Company? A. Yes, they were.

"Q. Now directing your attention to Mr. Harry Grossman, what position does he occupy in L. Kauffman Company? A. He is my assistant.

"Q. Does he have any title? A. Well, he is assistant to me.

"Q. Assistant to you? A. That is right.

"Q. And has he always occupied that same position? A. For what period are you speaking?

"Q. Well, ever since your father died, let's take it. Over what period has he occupied that position, then, you tell me that better? A. Ever since he came to L. Kauffman Company, when he left Wolf-Bond he occupied that position.

"Q. And he occupies the same position now? A. Yes.

"Q. And that is the only position he has ever occupied since your father's death in L. Kauffman Company, is that correct or with the estate, or has he occupied some other position? A. Well, we don't go in much for titles at L. Kauffman Company, I don't know how to classify him; we are all interest in doing the work. Titles are unimportant.

"Q. Well, what is his business? Well, he is my assistant, you can call him whatever title you like, that is immaterial as far as I am concerned.

"Q. No, Mr. Kauffman, I am not making myself understood to you—I am asking you what position he holds. A. He is my assistant.

"Q. Has he been your assistant since he has been employed at L. Kauffman Company? A. Well, not prior to my father's death, no.

"Q. Since you have been at L. Kauffman? A. Yes, and from the time he came from Wolf-Bond Company, at the time of my father's death he was at the Wolf-Bond Company.

"Q. He was working at Wolf-Bond Company at the time of your father's death? A. Yes.

"Q. And subsequent to that he was employed at L. Kauffman Company, is that correct? A. Yes, but at Wolf-Bond Company he was working for my father, too, because we purchased all of Wolf-Bond Company merchandise."

In addition, Mr. Grossman testified thus:

"The Court: May I ask just what are your duties with the Kauffman Company? A. Well, I am an assistant to Mr. Lazare M. Kauffman and in his absence I run the business, which consists of contacting the packers, the various packing industries, purchasing their pelts, trading with the individual accounts, watching our costs, working out tests, individual tests on pelts, to see that we get the yield for which we pay; suggest policy at times, work for the company on labor relations, and do everything that one having the responsibility of a plant would do in the absence of the owner; and when he is there we work very close together.

"The Court: Your position, then, might be said to be assistant to the manager, general manager? A. Yes, sir."

Since no error appears in the record, the orders appealed from are and each is affirmed.

Moore, P. J., and Wood (W. J.), J., concurred.

A petition for a rehearing was denied December 15, 1944, and appellant's petition for a hearing by the Supreme Court was denied January 18, 1945.